UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED IN OPEN COURT
1.16.13
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES OF AMERICA

v.                                                  CASE NO. 3:12-cr-171-J-32MCR

RONALD E. ROBINSON

### UNITED STATES' NOTICE OF MAXIMUM PENALTIES, ELEMENTS OF OFFENSE, PERSONALIZATION OF ELEMENTS AND FACTUAL BASIS

The United States of America, by and through its undersigned Assistant United States Attorney, files the following Notice of Maximum Penalties, Elements of Offense, Personalization of Elements and Factual Basis:

#### A. MAXIMUM PENALTIES

The Defendant has expressed a desire to enter a plea of guilty to the single offense charged in the Indictment. Count One charges the defendant with Tampering With Consumer Products, in violation of Title 18, United States Code, Section 1365(a)(4).

Count One carries a maximum sentence of 10 years imprisonment, a fine of $250,000, or both imprisonment and a fine, a term of supervised release of not more than 3 years, and a special assessment of $100, due at sentencing. If the Defendant violates the terms and conditions of any supervised release he could face up to an additional 2 years of imprisonment and an additional term of supervised release. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s).

## B. ELEMENTS OF THE OFFENSE

The defendant acknowledges understanding the nature and elements of the offense with which the defendant has been charged and to which the defendant is pleading guilty. The elements of Count One are:

<u>First</u>: The Defendant tampered with a consumer product that affected interstate commerce;

<u>Second</u>: The tampering was done with reckless disregard that another person would be placed in danger of death or bodily injury; and

<u>Third</u>: The tampering was done under circumstances manifesting extreme indifference to such risk.

## C. PERSONALIZATION OF ELEMENTS

1. On or between April 10, 2012, through on or about June 15, 2012, in the Middle District of Florida, did you tamper with a consumer product affecting interstate commerce?

2. Did you do so with reckless disregard that another person would be placed in danger of death or bodily injury?

3. Were you indifferent to the risk your tampering had caused?

## D. FACTUAL BASIS

On June 12, 2012, Jacksonville Sheriff's Officer, C.L. Kornegay responded to the CVS store located at 9509 San Jose Blvd., Jacksonville, FL. Manager Dustin McDonald advised Officer Kornegay that a white male had been

2

in the store several times over the last month and had purchased and returned single use enemas for refunds on at least four occasions, including on June 5, 2012. McDonald said the customer told him the enemas were for his mother and that she no longer needed them. According to McDonald, the refunded enemas had been returned by CVS to the store's display shelf for resale.

McDonald said he became suspicious of the customer and his repeated story about not needing the enemas, so he checked the enemas that had previously been returned to the shelf (on June 5, 2012), and found that all of the enemas in each of three returned boxes appeared to be used and that it appeared that the customer had re-glued the boxes to make them look as if they had never been opened or used. These particular enemas are sold in boxes with six separate disposable enemas to the box.

On June 12, 2012, the same customer attempted to return another box of enemas that had been purchased the previous day. Because of the June 5, 2012, incident, the manager advised the customer that he could no longer take returns for this item. The customer left the store and McDonald contacted the Jacksonville Sheriff's Office who took a report and collected the evidence.

On June 13, 2012, McDonald contacted Officer Kornegay and advised him that he had located what he believed to be the customer's vehicle in a neighboring apartment complex located at 4320 Sunbeam Rd, Jacksonville, FL. Kornegay conducted an NCIC check of the vehicle and found it registered to

3

Kimberly Michelle Carranza (later determined to be Robinson's roommate).

On June 14, 2012, Will Brannon, Special Agent, Food and Drug Administration, was contacted by Rebecca Capwell, Sr. Analyst, Quality Assurance for CVS Store Brands in Woonsocket, Rhode Island. Capwell reported that CVS Store #7129 located at 9509 San Jose Boulevard, Jacksonville, Florida, had identified a consistent pattern of CVS product returns by a specific customer purchasing and returning CVS Brand Enema Product (value packs of six). Capwell stated that the customer had used a credit card for the first purchase of enema products and had also made a purchase of medication from the pharmacy in the name of Ronald Robinson at the same time. Capwell further stated that an inquiry with the credit card company found that the card used by Robinson belonged to Kimberly Carranza, who is also the registered owner of the vehicle being used by Robinson.

On June 15, 2012, Kornegay and Brannon presented McDonald with a photo spread of potential suspects including Ronald Eugene Robinson and McDonald positively identified Ronald Eugene Robinson as the individual who had returned used enemas to the store on multiple occasions. A second CVS employee, Lindsay Larson, viewed a secondary set of the photo spread and she also positively identified Ronald Eugene Robinson as having been in the store.

Both CVS and law enforcement officials became concerned about the risk of disease contamination to customers who may have unknowingly

4

purchased used enemas returned to CVS by Robinson. Not knowing whether Robinson carried any communicable diseases, and uncertain as to how many used enemas had been resold, a decision was made to release some facts regarding the incident as a public safety measure. As a result, several purchasers of the used enemas were identified. CVS also released to Agent Brannon credit card information for unknown buyers who could be tied to the purchases. Grand Jury subpoenas for holder information resulted in the identification of several more purchasers.

Dr. Sheila Murphey, M.D., Branch Chief, Infection Control Devices Branch, Division of Anesthesiology, General Hospital, FDA, was consulted regarding the likelihood that a communicable disease or infection could be transferred between enema users. She rendered this written opinion:

> *Normal rectal flora is predominantly anaerobic bacteria (gram-negative bacilli, anaerobic cocci and a few gram positive bacilli, including Clostridium species) with a significant aerobic flora of gram-negative bacilli and streptococci merging to the perianal skin flora at the anus. Invasive devices used in the rectum can be contaminated not only with the normal bacterial flora of the lower gut and perineal skin but also with bloodborne pathogens due to traumatic disruption of the mucosal/epithelial barrier and resultant local bleeding. The mostly likely bloodborne pathogens to be*

5

transmitted by this route could include the hepatitis B and C viruses and the human immunodeficiency virus (HIV). If an invasive procedure such as an enema is performed on a person who has a chronic, relatively asymptomatic transmissible infection such as amebiasis, nematode infection or the salmonella carrier state, an invasive device such as an enema tip and squeeze bottle might become contaminated with such pathogens.

The efficiency of transmission of pathogens depends on the infectious inoculum available, the pathogenicity of the microbes and the ability of the host to resist infection or already be immune to it. The best information on the transmissibility of gastrointestinal illness comes from volunteer studies of oral doses of pathogens plus epidemiologic studies of disease outbreaks. By the oral route, it takes about 100,000 Salmonella to reliably infect volunteers but only 10 Shigella species. The noroviruses clearly spread with very small inocula. The portal of entry of the pathogen also plays a role. The rectum is not usually a "portal of entry" for the body. However, it can become one, usually with invasive procedures and contaminated instruments and also with sexual activity.

The likelihood that a "used" enema could transmit an infectious disease from the "first user" of this device intended for single use

only to an unsuspecting "second user" would depend upon whether:

The "first user" had a potentially transmissible infection.

The degree of trauma during use to the rectum/anus of the first user; this could increase with device size, especially relative to the user and would increase the risk of blood contamination of the device plus the risk of transmission of bloodborne pathogens.

Whether the "second user" was immune to one or more of the possible infections which could potentially be transmitted by an invasive rectal device; for example, was the second user immunized against hepatitis B?

The risk to the "second user" from acquisition of the normal rectal or perineal skin flora of the "first user" is very low although it is not zero. For example, if the "first user" is an asymptomatic carrier of vancomycin-resistant enterococcus (VRE) and transmitted this microbe to the "second user" this event would not result in immediate disease. However, GI carriage of VRE puts the "second user" at risk for VRE invasive disease in the future during a course of antibiotic therapy for some unrelated event. The risk of acquiring disease-causing pathogens from the "first user" is, of course, of much more concern for the "second user".

7

> *The question asked of CDRH is stated to be "is it possible for the customers who may have purchased the used enemas and then used them to contract any diseases from dried fecal matter? Are these type of diseases killed when they are in contact with air?" The answer is a qualified "yes" with a reminder that microbial contamination on a device need not be visible. Microbial survival outside of its normal habit will be affected by local temperature, moisture/dryness, the size of the microbial population (larger populations survive longer in adverse conditions), the type of microbe and the interval between device contamination and device reuse by the "second user". Based on experiences with inadequately disinfected lower GI endoscopes, the pathogens of greatest concern (because they are more likely to survive adverse environmental conditions) would include the hepatitis B virus (HBV), Clostridium difficile, the hepatitis C virus (HCV), Noroviruses and Cryptosporidia. However, many other pathogens are of at least some possible concern for transmission depending on the health state of the original user, the means used to disguise the fact that the product was allegedly "used" and the interval/device storage conditions until the devices were "reused".*

Used enemas and packaging were recovered from CVS and submitted to FDA labs for testing. David L. Craft, molecular biologist at the Forensic Chemistry Center, FDA, Ohio, examined the submissions and concluded that there are apparent signs of tampering on the external and internal packaging of the enemas. He also identified the presence of multiple incidents of microbial activity on the applicators in the form of escherichia coli, staphylococcus hominis, corynebacterium xerosis, enterococcus durans, enterococcus faecalis, micrococcus luteus, staphylococcus epidermis, and clostridium tertium.

Dr. Murphey would testify that these particular bacterium are all aerobic and therefore can survive for short periods of time in air. She states that these bacterium are also present on many surfaces in the environment but that the combination of them all together is consistent with the device having been in contact with the human anus. She states that these bacterium are commonly present in everyone and are not necessarily dangerous, although they can cause disease if they invade areas of the human body other than the gastrointestinal tract as a result of other injury or disease such as diverticulitis or appendicitis or other trauma to the intestines.

Dr. Murphey further states that the potential for transmission of disease through the identified enema tampering is significant because humans can carry many infectious anaerobic bacterium (difficult to detect because they die when exposed to air) as well as infectious pathogens (hepatitis, HIV, salmonella)

9

without displaying any symptoms because of dormancy or a natural immunity. Consequently, an illness can be easily transmitted unknowingly. In other words, humans can carry disease without knowledge of the presence of disease and transmit those diseases through the mechanism involved here.

Dr. Murphey would testify that in her opinion the act of using an enema and then concealing the fact that it has been used, in a manner which creates a likelihood that it may be reused by another person, creates a risk of bodily injury.

Craft further stated that evidence of product tampering was noted on some of the top carton flaps as the glue seam on the surface of the top inner flap was separated from the top outer flap and a layer of carton paper was torn from the top outer flap. The outer top flap was ripped completely across the top flap. Adhesive material was present on some of the cartons inconsistent with untampered control boxes. Transparent tape across the outer top flap and down both sides of the carton was reported to have been placed on the carton during collection by FDA. No evidence of additional adhesive material was observed.

The Florida Department of Law Enforcement has identified a DNA profile on at least one of the used enemas. It has been identified as matching a known sample of Robinson's DNA.

Respectfully submitted,

ROBERT E. O'NEILL,
United States Attorney

By: _____

JAY TAYLOR
Assistant United States Attorney
Florida Bar No. 0511730
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone:  (904) 301-6300
Facsimile:  (904) 301-6310
Email:  jay.taylor@usdoj.gov

United States v. Ronald Robinson          Case No. 3:12-cr-171-J-32MCR

## CERTIFICATE OF SERVICE

I hereby certify that on January, 1yth, 2013, I filed the foregoing in open court and provided a copy of this document by hand delivery to the following:

Roland Falcon, Esq.

JAY TAYLOR
Assistant United States Attorney

12